**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Bitounis v. Interactive Brokers, L.L.C.*, **Slip Opinion No. 2026-Ohio-2268.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2268

BITOUNIS ET AL., APPELLEES, *v.* INTERACTIVE BROKERS, L.L.C., APPELLANT, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Bitounis v. Interactive Brokers, L.L.C.*, Slip Opinion No. 2026-Ohio-2268.]**

*Civil law—R.C. 1707.43(A)—Brokerage firm that performed only routine business activities for its customer after that customer unlawfully sold securities did not participate or aid in the unlawful sales and therefore cannot be held liable for those sales under R.C. 1707.43(A)—Court of appeals' judgment reversed and trial court's judgment reinstated.*

No. 2024-1290—Submitted September 16, 2025—Decided June 18, 2026.

APPEAL from the Court of Appeals for Cuyahoga County, No. 113193, 2024-Ohio-2905.

_____

SHANAHAN, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, DETERS, and HAWKINS, JJ., joined. BRUNNER, J., dissented, with an opinion.

**SHANAHAN, J.**

{¶ 1} In this appeal, we are asked to decide whether a brokerage firm that provides routine account services for a customer's investment fund as part of its normal business activities may be held liable under R.C. 1707.43(A) for the customer's prior unlawful sale of securities.

{¶ 2} We conclude that R.C. 1707.43(A) does not extend liability to brokerage firms whose routine business activities were performed after the unlawful sale of securities was complete. Because the allegations raised in the amended complaint filed by appellees, 21 investors who contend they lost money through the purchase of unlawful securities (collectively, "the investors"),[1] describe primarily routine postsale brokerage services performed by appellant, Interactive Brokers, L.L.C. ("IB")[2]—e.g., account setup, compliance checks, and trade execution—we conclude that IB did not participate or aid in the unlawful sales and therefore cannot be held liable for those sales under R.C. 1707.43(A). The amended complaint also includes allegations that before the account was opened, IB reviewed certain materials, including a Private Placement Memorandum ("PPM") naming IB as the fund's broker, before agreeing to open the brokerage account. But, as explained in the analysis below, those allegations do not describe

---

1. The 21 investors who filed suit are Constantine Bitounis; Goudas Enterprises, Ltd.; Gus Pyros; Sophocles Sophocleus; George Voutsiotis; Vivy Voutsiotis; Karvo Companies, Inc., d.b.a. Karvo Paving Company; G & Y Group, L.L.C.; Corrosion Resistance, Ltd.; GAADY, L.L.C.; George Karvounides; Anna Karvounides; Yianni Karvounides; Dina Karvounides; Evangelos Varvaras; Angela Varvaras; Haralambos Gonos; Timothy Moff; Auctus Properties, L.L.C.; Alexandra Voutsiotis; and Susan George.

2. Two defendants were named in the amended complaint: Interactive Brokers, L.L.C., and "Interactive Brokers (a fictitious name)."

conduct tied to the solicitation, negotiation, or execution of any specific sale of securities to the investors. We therefore reverse the judgment of the Eighth District Court of Appeals and reinstate the trial court's dismissal of the amended complaint.

## I. BACKGROUND

{¶ 3} Between 2015 and 2021, Constantine Antonas operated the Epitome Investment Fund, L.P. ("Epitome"), a private-investment hedge fund that he alone created and managed. The investors alleged in an initial complaint, subsequently followed by an amended complaint, that Antonas had solicited investors, promising "high risk-adjusted returns" with limited downside risk. In total, Antonas collected roughly $25 million in investor funds.

{¶ 4} Antonas was not registered as an investment adviser with the SEC and did not qualify for an exemption from registration. Antonas drafted a PPM identifying IB as the fund's "Broker," which, according to the investors, lent legitimacy to Antonas's scheme.

{¶ 5} IB operates as a global online-brokerage platform. Its function is to clear trades for its customers (i.e., account holders) who own or control the assets being traded. Before opening an account for a customer, IB complies with federally mandated "Know Your Customer" anti-money-laundering procedures under 31 C.F.R. 1023.220 and Financial Industry Regulatory Authority Rule 2090, which require identity verification and documentation. Ultimately, IB opened a trading account for Epitome, allowing Antonas to deposit the funds invested in Epitome and execute trades.

{¶ 6} Antonas lost nearly all the invested capital in Epitome through speculative trades. He died in 2021, leaving the investors without recourse against him. So the investors sued IB, alleging that IB had participated in or aided Antonas in selling unregistered securities and seeking recovery of their invested funds under R.C. 1707.43(A).

{¶ 7} The investors alleged that IB had reviewed and approved the PPM despite several purported "red flags," including that Antonas had listed his home address as the principal place of business for Epitome, had not listed the name of the fund's auditor or administrator, and had identified himself—a 20-year-old who was not licensed to be an investment adviser or to sell securities—as the fund's manager. Once the account was established, IB performed standard brokerage functions. The investors alleged that given IB's mandatory-compliance-monitoring obligations, IB should have known that it was supporting Antonas's unlawful activities.

{¶ 8} IB responded by filing a motion to dismiss the investors' amended complaint under Civ.R. 12(B)(6) for "fail[ure] to state any claim against [IB] upon which relief may be granted for participating or aiding in sales of securities in violation of the Ohio Securities Act, R.C. 1707.43." In its motion to dismiss, IB asserted that the investors had not alleged that IB had "played any role in Antonas's solicitation of investors, marketing of [Epitome], issuance of securities interests, or sale of interests in the fund." IB claimed that the investors' failure to allege (and their inability to allege) that they had purchased securities through the IB trading account was fatal to their claims because R.C. 1707.43 permits a rescission remedy only to purchasers in the unlawful sales of securities.

{¶ 9} The trial court granted IB's motion to dismiss. The Eighth District reversed, concluding that the allegations made by the investors in the amended complaint "were legally sufficient to set forth a claim for relief under R.C. 1707.43(A)." 2024-Ohio-2905, ¶ 37 (8th Dist.).

{¶ 10} We accepted jurisdiction over IB's sole proposition of law:

A financial institution such as a brokerage firm is not liable for participating in an illegal sale of securities under R.C.

4

1707.43(A) when its only connection to the sale to the [investors] was peripheral and as part of its normal business activities.

*See* 2024-Ohio-5529.[3]

## II. ANALYSIS

{¶ 11} We review a Civ.R. 12(B)(6) dismissal de novo, performing an independent review of the record and giving no deference to the lower court's decision. *See Perrysburg Twp. v. Rossford*, 2004-Ohio-4362, ¶ 5. Because this appeal stems from a motion to dismiss under Civ.R. 12(B)(6), we accept the factual allegations in the amended complaint as true and make all reasonable inferences in favor of the nonmoving party to determine, as a matter of law, whether the allegations in the amended complaint state a claim for relief within the scope of R.C. 1707.43(A). *See Valentine v. Cedar Fair, L.P.*, 2022-Ohio-3710, ¶ 12. Unsupported legal conclusions—such as assertions that IB aided in making the securities sales to the investors—are not accepted as true unless supported by factual allegations. *See Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192-193 (1988). The question is not whether the plaintiffs will ultimately prevail, but whether the factual allegations, which we assume to be true, describe conduct falling within the purview of R.C. 1707.43(A). Here, the allegations related to IB's conduct, even if accepted as true, fall outside the statute's scope.

{¶ 12} When the language of a statute is plain and unambiguous, we apply it as written. *Jones v. Action Coupling & Equip., Inc.*, 2003-Ohio-1099, ¶ 12; *Summerville v. Forest Park,* 2010-Ohio-6280, ¶ 18. Here, the Eighth District erred

---

3. The dissent says that this appeal was improvidently accepted for discretionary review because the question whether IB's conduct relating to Antonas's sale of securities was merely peripheral and part of its normal business activities is an inappropriate question for this stage of review. But as explained in the analysis, the trial court was correct in granting IB's motion to dismiss because the investors did not allege that IB played a role in the *sale* of the securities, and more than a peripheral involvement is required for liability to attach under R.C. 1707.43(A).

when it focused on the remedial purpose of Ohio's Blue Sky Law, also known as the Ohio Securities Act (R.C. Ch. 1707), therefore broadening the reach of R.C. 1707.43(A). But we do not elevate legislative intent over the plain text of a statute.

{¶ 13} R.C. 1707.43(A) provides:

> [E]very sale or contract for sale made in violation of [R.C. Ch. 1707] is voidable at the election of the purchaser. The person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser . . . .

{¶ 14} In interpreting the statutory text, each phrase must be given effect, and no portion of the provision is read in isolation from the whole. *See Vossman v. AirNet Sys., Inc.*, 2020-Ohio-872, ¶ 14. As explained below, the phrase "in making such sale" limits liability to every person whose conduct brings about the unlawful sale itself, not to every person whose peripheral business functions can be extraneously tied to the sale afterward. Similarly, the phrase "in any way" expands the range of conduct that may qualify as participation or aid, but it operates within the boundary of conduct that occurs "in making such sale."

### A. R.C. 1707.43(A) Requires a Nexus to the Unlawful Sale of Securities

{¶ 15} R.C. 1707.43(A) imposes liability for the unlawful sale of securities on "[t]he person making such sale or contract for sale, and every person that has participated in or aided the seller in any way in making such sale." The phrase "in making such sale" tethers liability to the sale itself. This court explained in *Boyd v. Kingdom Trust Co*. that "[t]he plain language of R.C. 1707.43(A) requires a person to have some nexus with the sale of illegal securities." 2018-Ohio-3156,

¶ 9. A connection to a broader investment scheme or transaction is not enough; the statute demands involvement in the sale to the purchaser. Conduct that relates to subsequent account activity also is not enough. The conduct must contribute to making the sale. The investors argue that in opening a brokerage account for Antonas after reviewing the PPM in which Antonas listed IB as Epitome's broker, IB's actions lent legitimacy to Antonas's scheme. But they do not allege that IB drafted, endorsed, or distributed the PPM to them or that IB played any role in presenting the PPM to them. By failing to assert a connection between IB and the investors' purchasing decisions, the allegations in the amended complaint are too attenuated to satisfy the requirement in R.C. 1707.43(A) that IB participated or aided Antonas "in any way in making such sale."

{¶ 16} This interpretation is in accord with this court's holding in *Bronaugh v. R. & E. Dredging Co.*, in which we recognized that the purpose of Ohio's Blue Sky Law is to deter those who sell or market unregistered securities, not to reach peripheral participants in ordinary business transactions. 16 Ohio St.2d 35, 41 (1968). And R.C. 1707.43(A) limits liability for the unlawful sale of securities to those persons who "participated in or aided the seller in any way in making such sale."

{¶ 17} In their amended complaint, the investors alleged that IB opened and serviced a brokerage account for Epitome and that before IB opened the account, it reviewed certain materials related to the investment fund. They do not allege any conduct by IB tied to the solicitation of the investors or the offering, negotiation, or execution of any sale of interests in Epitome. But liability does not arise when the financial institution's role was limited to executing transactions at the account holder's direction. *See Boyd* at ¶ 13; *see also Boomershine v. Lifetime Capital, Inc.*, 2008-Ohio-14, ¶15.

### B. R.C. 1707.43(A) Requires Participation or Aid in Making the Sale

{¶ 18} Even if a financial institution is connected to an unlawful sale of securities, liability for the sale attaches only for conduct that constitutes participation or aid "in making such sale," R.C. 1707.43(A). The statute requires conduct that furthers the unlawful sale itself. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 191-192 (1994) (civil liability by secondary actors for violations of the Securities Exchange Act of 1934 requires affirmative conduct expressly covered by statute); *see also Cox Communications, Inc. v. Sony Music Entertainment*, 607 U.S. __, 146 S.Ct. 959, 969-972 (Mar. 25, 2026) (Sotomayor, J., concurring in the judgment) (contributory liability cannot rest solely on a defendant's knowledge of a violation coupled with insufficient action to prevent it). Affirmative participation in the prohibited conduct is required.

{¶ 19} Decisions of other Ohio courts reinforce this affirmative-participation requirement. In *Federated Mgt. Co. v. Coopers & Lybrand*, the Tenth District Court of Appeals did not itself impose liability on a defendant under R.C. 1707.43 but instead held that because reasonable minds could come to different conclusions on the issue whether the defendant's conduct could be considered as aiding the seller in any way in making the unlawful sales of certain financial notes, summary judgment in favor of the defendant was inappropriate. 137 Ohio App.3d 366, 391-393 (10th Dist. 2000). Emphasizing evidence that suggested that the defendant's conduct went beyond ordinary commercial-banking activities and was related to the actual note offering, the court reasoned that a jury could find that evidence sufficient to satisfy the statute. *Id.* at 392-393. And in *Boland v. Hammond*, the Fourth District Court of Appeals held that liability arose under R.C. 1707.43(A) against a person who directly relayed sales terms to investors and arranged meetings with the seller of the securities at issue. 144 Ohio App.3d 89, 94-95 (4th Dist. 2001).

{¶ 20} IB did neither of those things here; it did not undertake promotional activity on behalf of Antonas or Epitome or relay sales terms to potential investors nor did it arrange investor meetings. Its routine brokerage services were standard, automated postsale functions. And IB's performance of these normal business activities lacks the nexus required to constitute its having "participated or aided" in the unlawful sale of securities under R.C. 1707.43(A). The dissent says that IB's failure to exercise reasonable diligence in monitoring Antonas's activity amounted to participation in or aiding in the unlawful sale of securities. We disagree. Any alleged failure by IB to exercise reasonable diligence in its compliance-monitoring duties does not equate to participation or aiding in the unlawful sale of securities by Antonas. *See Boyd*, 2018-Ohio-3156, at ¶ 9, 13.

### C. R.C. 1707.43(A) Does Not Extend to Peripheral or Postsale Business Activities

{¶ 21} The Eighth District essentially applied a "but for" causation theory, concluding that the investors' allegations in the amended complaint that IB's compliance-monitoring failures enabled Antonas to continue selling Epitome interests were sufficient to plead that IB had participated or aided in the unlawful sale of securities under R.C. 1707.43(A). 2024-Ohio-2905 at ¶ 35-37 (8th Dist.). That interpretation conflicts with the text of the statute, however, and with the long-held statutory interpretation by Ohio courts, which we reiterated in *Boyd*: "a financial institution's mere participation in a transaction, absent any aid or participation in the sale of illegal securities, does not give rise to liability under R.C. 1707.43(A)," *Boyd* at ¶13.

{¶ 22} Routine brokerage-firm functions that occur after the unlawful sale of securities by the firm's customer are not acts that constitute participating or aiding "in making such sale," R.C. 1707.43(A). The statute's language requires a nexus between the brokerage firm's conduct and the unlawful sale of securities, which, as explained above, is absent here.

**{¶ 23}** Even when viewed in the light most favorable to the investors, the allegations in the amended complaint describe conduct that is not tied to the solicitation, negotiation, or execution of any particular sale of securities: the investors' allegations refer to IB's conduct as it relates to the management of funds already invested in Epitome from the sale of unlawful securities, as opposed to conduct that aided Antonas in any way in making such sales. IB's alleged conduct does not bear the required nexus to any specific sale of securities to the investors.

### III. CONCLUSION

**{¶ 24}** R.C. 1707.43(A) imposes joint and several liability on every person who makes, or participates or aids the seller in making, an unlawful sale of securities. The statute requires a nexus between the person's conduct and the sale itself. The allegations in the amended complaint describe routine brokerage and custodial services performed by IB after Antonas made unlawful sales of securities to the investors, as well as conduct by IB before it opened the brokerage account for Antonas, none of which has a nexus to any specific sale of securities to the investors. Accordingly, IB did not participate or aid the seller in making such sales to the investors. IB's conduct, therefore, does not fall within the scope of R.C. 1707.43(A).

**{¶ 25}** Because the investors' amended complaint fails to state a claim upon which relief can be granted under R.C. 1707.43(A), the trial court correctly dismissed the amended complaint. The judgment of the Eighth District Court of Appeals is therefore reversed, and the trial court's judgment of dismissal is reinstated.

Judgment reversed

and trial court's judgment reinstated.

_____

**BRUNNER, J., dissenting.**

{¶ 26} The Eighth District Court of Appeals applied the correct standard of review—the same legal standard announced in the majority opinion, *see* majority opinion, ¶ 12-14—and correctly remanded this case to the trial court for further factual development. For these reasons, we should not have accepted the proposition of law submitted by appellant, Interactive Brokers, L.L.C., for discretionary review.

{¶ 27} In relaying my reasons for dissenting from the court's judgment, I rely on the factual and procedural background set forth in the majority opinion. The question whether Interactive Brokers' conduct relating to the sale of securities by Constantine Antonas in his management of the private-investment hedge fund Epitome Investment Fund, L.P. ("Epitome") was merely peripheral and part of its normal business activities or whether its conduct constituted "aid[ing] the seller in any way in making [an unlawful] sale," R.C. 1707.43(A), is an inappropriate question for this stage of review.

{¶ 28} Unfortunately, the majority opinion has adopted a reading of R.C. 1707.43(A) that is wildly untethered to its text. Incredibly, and in direct opposition to the statute's plain language, the majority opinion concludes that a financial institution bears liability for the unlawful sale of securities to which it is connected only if a plaintiff demonstrates that the institution acted knowingly or intentionally in aiding the unlawful sale, *see* majority opinion at ¶ 15.

{¶ 29} R.C. 1707.43(A) creates liability for every person or entity who "participated in or aided the seller *in any way*." (Emphasis added.) The phrase "in any way" could not be clearer; when a statute makes no mention of mental culpability, we are bound not to infer one. *See State v. Johnson*, 2010-Ohio-6301, ¶ 17 ("Offenses without any culpable mental state are strict-liability offenses, and they impose liability for simply doing a prohibited act.").

{¶ 30} The majority opinion cites *Cent. Bank of Denver, N.A. v. First*

*Interstate Bank of Denver*, 511 U.S. 164, 191-192 (1994), in support of its determination that R.C. 1707.43(A) requires a showing that the financial institution acted with intent or knowledge in aiding in the unlawful sale of securities. But the United States Supreme Court never explained what level of culpability should be attributed to an "aiding and abetting" claim under the Securities Exchange Act of 1934, because the law contained no provision for that kind of secondary liability. *Cent. Bank of Denver* at 191. *Cent. Bank of Denver* is not only irrelevant, but it also does not support the majority opinion's magic trick of adding an element of mental culpability to what was otherwise a question whether participation or aiding in an unlawful sale of securities had occurred. Federal courts have recognized that state provisions like R.C. 1707.43(A) are much broader than their federal counterparts and generally require no mental culpability. *See Riedel v. Acutote of Colorado*, 773 F.Supp. 1055, 1066 (S.D.Ohio 1991) (scienter is generally not required under laws like R.C. 1707.43).

{¶ 31} The fundamental purpose of R.C. Ch. 1707 is to protect the public from the sale of unregistered securities. *Callahan v. Class One, Inc.*, 58 Ohio St.3d 76, 77 (1991). It is no surprise that commentators have found statutory schemes such as the one in R.C. Ch. 1707 to place an affirmative duty on "all securities professionals involved in a securities transaction . . . to exercise due diligence" in ensuring that the registration and antifraud protections of such laws are complied with. Joseph C. Long, *Developments and Issues in Civil Liability Under Blue Sky Law*, 62 U.Cin.L.Rev. 439, 468 (1993). The majority opinion is impermissibly adding to the plain and simple language that the General Assembly used in R.C. 1707.43(A). Under this law—as clearly written—a financial institution's involvement in the unlawful sale of securities either occurred or it did not, and that involvement may include the institution's failing to have reasonable mechanisms in place to discover the unlawfulness of securities sales in which the institution participates or which the institution aids the seller in making.

{¶ 32} By its own concession, Interactive Brokers was authorized to monitor and perform compliance activities to prevent potential unlawful activity. Appellees, 21 aggrieved investors in Epitome, *see* majority opinion at ¶ 2, fn. 1, alleged in their amended complaint that despite its mandatory compliance monitoring, Interactive Brokers did not verify the registration status of the hedge-fund operator, approved large withdrawals, and ignored other "red flags" indicating unlawful trading activity until the $25 million that was initially invested was nearly depleted. These facts—accepted as true when reviewing a judgment of dismissal issued on a Civ.R. 12(B)(6) motion—are sufficient to plead a claim under R.C. 1707.43(A) that Interactive Brokers' failure to exercise reasonable diligence amounted to participation in or aiding in the unlawful sale of securities. The parties have a right to test these allegations against the evidence developed in discovery. *See* Ohio Const., art. I, § 5 ("The right of trial by jury shall be inviolate . . . ."); Ohio Const., art. I, § 16 ("every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law").

{¶ 33} Once again, this court has positioned itself as a "super fact-finder" by declaring as a matter of law the answers to questions of fact that are clearly within the purview of a jury. *See NC Ents., L.L.C. v. Norfolk & W. Ry. Co.*, 2026-Ohio-1429, ¶ 31 (Brunner, J., dissenting). Once again, we have unnecessarily and unfairly deprived parties of the right to seek justice before a trial even begins. *See id.* at ¶ 29 (finding that, as a matter of law, lawn-maintenance activities can never be sufficiently open and notorious to put a landowner on notice that a would-be adverse possessor is taking over the land); *Berkheimer v. REKM, L.L.C.*, 2024-Ohio-2787, ¶ 25 (finding that reasonable minds could come to but one conclusion about whether a consumer should expect to encounter a bone in a boneless chicken wing). The majority opinion today would have this court acting not only as the judge and jury, but also as the legislature. Today's decision is out of line with the purpose of R.C. Ch. 1707 and makes it nearly impossible for victims of securities

fraud to obtain relief from a financial institution that may have "participated in or aided the seller in any way in making" the unlawful sale of securities, R.C. 1707.43(A). I therefore dissent. I would dismiss this case as having been improvidently accepted.

_____

Meyer Wilson Co., L.P.A., David P. Meyer, Courtney M. Werning, and Jared W. Connors; and Cooper Elliott, Rex H. Elliott, Barton R. Keyes, and Kimberly E. Burroughs, for appellees.

Jones Day, Geoffrey J. Ritts, James R. Saywell, Samuel V. Lioi, Yvette McGee Brown, and H. Cole Hassay; and UB Greensfelder, L.L.P., and Jeffrey S. Dunlap, for appellant Interactive Brokers, L.L.C.

Rosca Scarlato, L.L.C., and Alan L. Rosca, urging affirmance for amicus curiae Public Investors Advocate Bar Association.

Bricker Graydon, L.L.P., Brodi J. Conover, and Ryan L. Richardson, urging reversal for amicus curiae The Securities Industry and Financial Markets Association and the Ohio Bankers League.

_____